# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| LAWRENCE HOLLIN, Derivatively on Behalf of Nominal Defendant INSPIRE MEDICAL SYSTEMS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| TIMOTHY P. HERBERT, SHELLEY G. BROADER, CYNTHIA B. BURKS, GARY L. ELLIS, GEORGIA GARINOIS-MELENIKIOTOU, SHAWN T. MCCORMICK, DANA G. MEAD, JR., CASEY M. TANSEY, JERRY C. GRIFFIN, MARILYN CARLSON NELSON, CHARISSE Y. SPARKS, and RICHARD J. BUCHHOLZ, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| INSPIRE MEDICAL SYSTEMS, INC., | ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Lawrence Hollin ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Inspire Medical Systems, Inc. (herein referred to as "Inspire" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers

seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, including the allegations of the amended class action complaint filed in the securities class action captioned *City of Hollywood Firefighters' Pension Fund v. Inspire Medical Systems, Inc., et al.,* Case No. 0:23-cv-03884-NEB-DJF (D. Minn.) (the "Securities Class Action"), conference call transcripts and announcements, filings with the United States Securities and Exchange Commission (the "SEC"), press releases published by and regarding Inspire, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Inspire against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least May 3, 2023 and November 7, 2023, inclusive (the "Relevant Period") and violation of the federal securities laws by causing the issuance of materially false and misleading statements in the Company's SEC filings and in other public statements that have exposed the Company to massive class-wide

liability, as well as the expenditure substantial defense costs in connection with the Securities Class Action, as set forth below.

2.      Inspire is a medical technology company whose sole offering is a surgical implant to treat sleep apnea (the "Inspire device").

3.      Leading up to the Relevant Period, commercial insurance reimbursements for Inspire devices constituted roughly 70% of Inspire's revenues. Accordingly, the Company's target customers are commercial insurance patients.

4.      In order for Inspire to secure the insurance reimbursements that fueled the Company's growth, patients were required to undergo a thorough "prior authorization" process involving, among other things, the submission of extensive documentation by medical providers, demonstrating difficulty with alternative sleep apnea treatments and the suitability of the Inspire device.

5.      Inspire developed a Prior Authorization Approval Process ("PAAP") to more efficiently secure prior authorization by guiding patients and medical providers through the process. The PAAP was central to the Company's continued growth, with the Company specifically highlighting its direct engagement with patients and medical providers to streamline the prior authorization process and secure higher rates of commercial insurance reimbursement.

6.      At the end of 2022, the Company began to significantly modify the PAAP to reduce costs by discontinuing direct engagement with medical providers,

leaving medical facilities to handle the complex process on their own. Importantly, the Company did not disclose these changes to the public or its shareholders.

7.     Throughout the Relevant Period, certain of the Company's executives and members of its Board issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Company had dramatically divested from the PAAP and had significantly reduced its involvement with the prior authorization process; (ii) as a result, the Company lost customers due to delays and issues with the prior authorization process; and (iii) as a result of the foregoing, positive statements issued regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

8.     The truth was revealed on November 7, 2023, when the Company issued a press release reporting revenue that fell significantly below analyst expectations for the Company's third fiscal quarter of 2023. In the press release, the Company attributed its poor financial results to its implementation of "a pilot program regarding prior authorization submissions by [its] customers"

9.     During an earnings call held on the same day, the Company specifically attributed the disappointing financial results to a decision by management to "*minimize our involvement with [our customers'] prior authorization process*."

The Company further revealed that, due to the changes in the PAAP, "a significant number of our customer[s] experienced challenges with their prior authorization submission process," leading to a "decrease in the number of submissions by our customers seeking prior authorization" and an "impact on the number of implant procedures."

10.     On this news, the price of Inspire stock declined nearly 20% in one day, closing at $129.95 per share on November 8, 2023.

11.     As a result of the foregoing, the Securities Class Action was filed, exposing the Company to massive class-wide liability.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Sections 10(b), and 21D of the Securities Exchange Act of 1934 ("Exchange Act"). This Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

13.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and

instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

16.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), as Inspire maintains its principal place of business in this District and a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District.

## PARTIES

### Plaintiff

18.     Plaintiff is, and has been at all relevant times, a shareholder of Inspire.

### Nominal Defendant

19.     Nominal Defendant Inspire is incorporated under the laws of the State of Delaware.

20.     The Company's principal executive offices are located at 5500 Wayzata Boulevard, Suite 1600, Golden Valley, Minnesota 55416.  Inspire's common stock

trades on the New York Stock Exchange ("NYSE") under the ticker symbol "INSP."

***Individual Defendants***

21.     Defendant Timothy P. Herbert ("Herbert") has served as President, Chief Executive Officer ("CEO"), and as a member of the Board of Inspire since 2007. According to the Company's public filings, Defendant Herbert received $5,675,394 in 2023 in compensation from the Company. As of March 5, 2024, Defendant Herbert beneficially owned 547,328 shares of Inspire common stock, worth $98,568,300[1] and constituting 1.8% of the Company's total outstanding shares.

22.     Defendant Shelly G. Broader ("Broader") has served as a member of the Board since October 2020. According to the Company's public filings, Defendant Broader received $195,625 in 2023 in compensation from the Company. As of March 5, 2024, Defendant Broader beneficially owned 7,051 shares of Inspire common stock, worth $1,269,815.

23.     Defendant Cynthia B. Burks ("Burks") has served as a member of the Board since July 2022. According to the Company's public filings, Defendant Burks received $231,875 in 2023 in compensation from the Company. As of March 5, 2024, Defendant Burks beneficially owned 1,277 shares of Inspire common stock,

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $180.09 per share closing price of Inspire common stock on March 5, 2024.

worth $229,975.

24.    Defendant Gary L. Ellis ("Ellis") has served as a member of the Board since July 2019. According to the Company's public filings, Defendant Ellis received $200,000 in 2023 in compensation from the Company. As of March 5, 2024, Defendant Ellis beneficially owned 14,414 shares of Inspire common stock, worth $2,595,817.

25.    Defendant Georgia Garinois-Melenikiotou ("Melenikiotou") has served as a member of the Board since July 2020 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Melenikiotou received $195,000 in 2023 in compensation from the Company. As of March 5, 2024, Defendant Melenikiotou beneficially owned 6,304 shares of Inspire common stock, worth $1,135,287.

26.    Defendant Shawn T. McCormick ("McCormick") has served as a member of the Board since January 2017 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant McCormick received $205,000 in 2023 in compensation from the Company. As of March 5, 2024, Defendant McCormick beneficially owned 54,008 shares of Inspire common stock, worth $9,726,301.

27.    Defendant Dana G. Mead, Jr. ("Mead") has served as a member of the Board since July 2008 and serves as a member of the Audit Committee. According

to the Company's public filings, Defendant Mead received $195,000 in 2023 in compensation from the Company. As of March 5, 2024, Defendant Mead beneficially owned 48,453 shares of Inspire common stock, worth $8,725,901.

28.     Defendant Casey M. Tansey ("Tansey") has served as a member of the Board since January 2008. According to the Company's public filings, Defendant Tansey received $196,875 in 2023 in compensation from the Company. As of March 5, 2024, Defendant Tansey beneficially owned 48,266 shares of Inspire common stock, worth $8,692,224.

***Former Director Defendants***

29.     Defendant Jerry C. Griffin ("Griffin") served as a member of the Board between January 2008 and May 2024. According to the Company's public filings, Defendant Griffin received $196,875 in 2023 in compensation from the Company.

30.     Defendant Marilyn Carlson Nelson ("Nelson") served as a member of the Board between November 2016 and May 2024. According to the Company's public filings, Defendant Nelson received $229,375 in 2023 in compensation from the Company. As of March 5, 2024, Defendant Nelson beneficially owned 92,691 shares of Inspire common stock, worth $16,692,722.

31.     Defendant Charisse Y. Sparks ("Sparks") served as a member of the Board between July 2022 and July 2023 and currently serves as the Company's Chief Medical Officer ("CMO"). According to the Company's public filings,

Defendant Sparks received $231,875 in 2023 in compensation from the Company.

***Officer Defendant***

32.    Defendant Richard J. Buchholz ("Buchholz") has served as Inspire's Chief Financial Officer ("CFO") since 2014. According to the Company's public filings, Defendant Buchholz received $2,134,630 in 2023 in compensation from the Company. As of March 5, 2024, Defendant Buchholz beneficially owned 91,167 shares of Inspire common stock, worth $16,418,265.

33.    Defendant Buchholz and Defendant Herbert are collectively referred to herein as the "Officer Defendants."

***Non-Party Confidential Witnesses***

34.    This action is based on Plaintiff's review, by counsel, of an extensive record of public documents as well as the Amended Class Action Complaint (the "Amended Complaint") in the Securities Class Action ("Securities Class Action Complaint") which contains detailed allegations based on interviews with nine former Inspire employees (referred to herein as FEs 1-4) who provided information to plaintiffs' counsel in the Securities Action supporting the allegations in that case. These former employees provided information on a confidential basis and were described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

35.    FE 1 worked at Inspire between early 2019 and early 2024, beginning

as a Territory Manager before serving as Senior Territory Manager, responsible for market development in the greater Chicago area. FE 1 reported directly to Regional Sales Manager Dan Phalen.

36. FE 2 worked at Inspire between March 2022 and April 2023 as a Territory Manager in two different geographic territories. FE 2's responsibilities included coordinating with a network of surgeons to manage patient care, from post-implant through to final sleep study. FE 2 reported to a Regional Manager.

37. FE 3 worked at Inspire between June 2022 and October 2023 as a Territory Manager selling Inspire's device in Iowa. FE 3 reported to Regional Manager Tom Tesar.

38. FE 4 worked at Inspire between mid-2020 and June 2023 as a Territory Manager for the Wisconsin area.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39. By reason of their positions as officers and/or directors of Inspire, and because of their ability to control the business and corporate affairs of Inspire, the Individual Defendants owed Inspire and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Inspire in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Inspire and its shareholders.

40.     Each director and officer of the Company owes to Inspire and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Inspire, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42.     To discharge their duties, the officers and directors of Inspire were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

43.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Inspire, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

45.     To discharge their duties, the officers and directors of Inspire were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Inspire were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Inspire's own Code of Business Conduct and Ethics;

(b)     Conduct the affairs of the Company in an efficient, business-like

manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Remain informed as to how Inspire conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) Establish and maintain systematic and accurate records and reports of the business and internal affairs of Inspire and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Inspire's operations would comply with all applicable laws and Inspire's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g) Examine and evaluate any reports of examinations, audits, or

other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

46. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Inspire.

47. At all times relevant hereto, the Individual Defendants were the agents of each other and of Inspire and were at all times acting within the course and scope of such agency.

48. Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

51.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

52.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Inspire, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment

of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Inspire and at all times acted within the course and scope of such agency.

## INSPIRE'S CODE OF BUSINESS CONDUCT AND ETHICS

55. Inspire's Code of Business Conduct and Ethics (the "Code of Conduct") applies to all of Inspire's "directors, officers and other employees and individual contractors who perform services on behalf of the Company," and violations of the Code of Conduct will lead to "appropriate discipline, which may include termination of employment or, in the case of a director, a request that such director resign from the Board of Directors."

56. In a section titled **"Company Records,"** the Code of Conduct states, in pertinent part:

> Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, clinical development and clinical testing, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.
>
> All Company records must be complete, accurate and reliable in all material respects.

57.     In a section titled "**Accuracy of Financial Reports and Other Public**

**Communications**," the Code of Conduct states:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.
>
> The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

58.     In a section titled "**Compliance with Laws and Regulations**," the Code of Conduct states, in pertinent part: "Each employee has an obligation to comply with all laws, rules and regulations applicable to the Company's operations."

59.     In a subsection titled "**Public Communications Generally**," the Code of Conduct states:

> The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

## INSPIRE'S AUDIT COMMITTEE CHARTER

60.     Inspire's Audit Committee Charter states that the purpose of the Audit

Committee is to:

> [A]ssist the Board in its oversight of: (i) the integrity of the Company's
> financial statements; (ii) the Company's compliance with legal and
> regulatory requirements; (iii) the Company's risk management
> program; (iv) the independent auditor's qualifications and
> independence; (v) the performance of the Company's independent
> auditor; and (vi) the performance of the internal audit function. in its
> oversight of: (i) the integrity of the Company's financial statements; (ii)
> the Company's compliance with legal and regulatory requirements; (iii)
> the Company's risk management program; (iv) the independent
> auditor's qualifications and independence; (v) the performance of the
> Company's independent auditor; and (vi) the performance of the
> internal audit function.

61.     In a subsection titled "*Internal Controls*, the Audit Committee Charter

states that the Audit Committee shall:

> Review and discuss with management and the independent auditor (a)
> any major issues as to the adequacy of the Company's internal controls,
> any special steps adopted in light of material control deficiencies and
> the adequacy of disclosures about changes in internal control over
> financial reporting and (b) the Company's internal controls reports and
> the independent auditor's attestation report prior to the filing of the
> Company's Annual Report on Form 10-K.

62.     In a section titled "**Annual Financial Statements and Annual Audit,**"

the Audit Committee Charter states:

> 4.     Audit Problems. The Committee must discuss with the
>        independent auditor any audit problems or difficulties and
>        management's response, including any significant disagreements
>        with management.
>
> 5.     Form 10-K Review. The Committee must review and discuss the
>        annual audited financial statements with management and the

independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee must discuss with the independent auditor each identified critical audit matter, including the independent auditor's basis for identifying it and how it will be described in the independent auditor's report.

6.  Audit Committee Report. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

63.  In a subsection titled "*Form 10-Q Review*," the Audit Committee

Charter states:

The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including (a) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and (b) the critical accounting policies and practices being used.

64.  In a section titled "**Other Duties and Responsibilities**," the Audit

committee Charter states, in pertinent part:

8.  Review of Earnings Releases. The Committee must discuss the Company's earnings press releases, including the type and presentation of information to be included in such releases, as well as financial information and earnings guidance provided to analysts and rating agencies (particularly with regard to the use of pro forma or adjusted non-GAAP information), including such information included in any earnings call transcripts and presentations by management to investors. This may be done generally and does not require the Committee to discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

9.  Risk Assessment and Risk Management. The Committee must discuss and oversee the Company's policies with respect to risk

assessment and risk management and should discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

## SUBSTANTIVE ALLEGATIONS

### *Background*

65.     Inspire is a medical technology company based in Minnesota whose sole offering is the Inspire device, designed to treat sleep apnea. While most existing treatments for sleep apnea are comparatively cumbersome, like Continuous Positive Airway Pressure ("CPAP") machines, which involve patients wearing an uncomfortable mask while sleeping, the Inspire device is surgically implanted into the patient's chest, working with the patient's natural breathing process by stimulating the motor nerves that control the patient's tongue each time they take a breath to ensure the patient's airway remains open.

66.     The Inspire device sells at an average price of $25,000 per implant and generates substantially all of Inspire's revenues.

67.     The Company went public in May 2018 via initial public offering (the "IPO"). Following the IPO, Inspire experienced dramatic growth, reporting a 700% increase in revenues between 2018 and 2022.

68.     Leading up to the Relevant Period, commercial insurance reimbursements for Inspire devices constituted roughly 70% of Inspire's revenues. Accordingly, the Company's target customers are commercial insurance patients

who have difficulty with existing, more burdensome, sleep apnea treatments.

69.     In order for Inspire to secure the insurance reimbursements that fueled the Company's growth, patients were required to undergo a thorough "prior authorization" process involving, among other things, the submission of extensive documentation by medical providers, demonstrating that the patient experienced difficulties with other sleep apnea treatments. As part of the prior authorization process, patients were also required to participate in an overnight "sleep study" in a medical center or hospital for examination of the patient's respiratory and cardiovascular functions.

### Inspire Implements a Process to Streamline the Prior Authorization Process

70.     Inspire developed the PAAP to more efficiently secure prior authorization by guiding patients and medical providers through the process.

71.     The PAAP consisted of two key components. First, the Company encouraged prospective patients to seek out authorization at higher rates. This involved television, print, and online marketing campaigns and direct engagement with ENT doctors and sleep centers to spread awareness of the Inspire device. As part of this initiative, the Company opened its own call center, called the Advisor Care Program, help prospective patients schedule medical evaluations for the prior authorization process.

72.     The second component of the PAAP involved dedicating Company

personnel to coordinate with medical providers to streamline the prior authorization process. The Company trained its sales personnel extensively in the prior authorization process and created a "market access team," operating out of its central offices, which was comprised of experts in the process. The Company's sales personnel worked alongside the market access team help manage the prior authorization process, directing medical providers to complete the appropriate examinations, overseeing sleep studies, and assisting in patients' application and appeals processes.

73. Issues or delays in the prior authorization process compromised Inspire's ability to secure approval from patients' insurers and recognize revenue. Importantly, substantial delays in the prior authorization process caused some patients to lose interest in the Inspire device. Accordingly, the PAAP was central to the Company's continued growth, with the Company specifically highlighting its direct engagement with patients and medical providers to streamline the prior authorization process as the key to the PAAP.

74. Indeed, in the Company's 2022 Annual Report, filed on Form 10-K with the SEC on February 10, 2023, (the "2022 10-K") the Company stated under a section titled "***Our Competitive Strengths***," that it "helps patients and providers work with payors to secure prior authorization approvals in advance of initial treatment" and specifically touted its "[d]edicated team focused on providing market

access for patients and providers." Specifically, the 2022 10-K stated:

**Our Competitive Strengths**

We believe the continued growth of our company will be driven by the following competitive strengths:

\* \* \*

***Dedicated team focused on providing market access for patients and providers. We have a refined, efficient approach to advance patients, once identified, to placement of the Inspire system.*** When required, our dedicated market access team helps patients and providers work with payors to secure prior authorization approvals in advance of initial treatment. In addition, this team proactively works with payors to establish positive coverage policies when needed by highlighting the compelling clinical data and the value of our Inspire therapy. This highly effective team has been successful in helping to secure reimbursement from hundreds of commercial payors to date, and positive coverage policies from most U.S. commercial payors, including virtually all large national payors.

75. The Company similarly expressed in its 2022 10-K that the PAAP, and specifically, the Company's direct engagement with patients and physicians throughout the prior authorization process, was one of two "core" pillars of its reimbursement strategy:

**Prior Authorization Approval Process**

A second pillar of our reimbursement strategy includes leveraging our market access team to assist patients and physicians in obtaining appropriate prior authorization approvals in advance of treatment. We believe our market access team is highly effective in working with patients and physicians to obtain prior authorizations for our Inspire system including assisting with the appeals process. We have received hundreds of prior authorization approvals from all of the largest commercial payors, for example Anthem, Cigna, Blue Cross Blue

Shield, United Healthcare, and Humana. We believe we will continue to benefit from this efficient prior authorization process.

***Former Employees Recount the Company Implementing Drastic and Undisclosed Changes to the PAAP, Causing Substantial Harm to Inspire's Business***

76.     While the PAAP helped the Company generate substantial revenue, it also came with significant operating costs. As a result, despite dramatic revenue growth, Inspire failed to report a profitable quarter in its first four and a half years as a public company. Accordingly, at the end of 2022, the Company implemented a strategy to reduce costs by discontinuing direct engagement with medical providers, leaving medical facilities to handle the complex process on their own. Additionally, Inspire altered its incentive compensation, no longer incentivizing its sales personnel to coordinate with medical providers to ensure prompt and successful completion of the prior authorization process. As the Individual Defendants would ultimately acknowledge at the end of the Relevant Period, the shifts signified the Individual Defendants deciding to "minimize [their] involvement with [the] prior authorization process." Importantly, these drastic changes, undermining the central components of the PAAP, were not disclosed publicly.

77.     These changes were seriously detrimental to Inspire's business and caused many prior authorizations to be significantly delayed or incomplete. Many prior authorizations were completed incorrectly, with errors or inadequate documentation, leading to higher rates of rejection by insurers. Exacerbating the

issue, medical providers, left to handle the prior authorizations on their own, lacked the expertise to guide patients through the appeals process when they were rejected. Further, the Company's decreased engagement with medical providers throughout the prior authorization process reduced Inspire's visibility into its sales pipeline. Several former employees who worked directly within the PAAP at Inspire confirmed that the changes were drastic and highly detrimental to Inspire's business.

78.     FE 1, a former Senior Territory Manager, responsible for market development in the greater Chicago area, recalled that, at the end of 2022, the Company was experiencing a significant influx of requested prior authorizations. FE 1 stated that, rather than hiring additional personnel to effectively manage the increased prior authorizations, the Company attempted to reduce costs by outsourcing these responsibilities to medical providers. FE 1 explained that the Company modified its incentive compensation, stating that "they took the incentive away from us to help with the prior authorizations."

79.     FE 1 explained that in early 2023, as a result of these changes, the Company had lost visibility into its sales pipeline, stating that the cost-cutting measure "definitely affected their accuracy of forecasting revenue because we lost the visibility of patient surgeries in the funnel." FE 1 further explained that medical providers lacked the expertise required to effectively manage the "intricate" process, stating that, before the changes "Inspire did these [prior authorizations] every day

and now the clinics were doing them weekly and [they] were not very good at it . . . they had more denials with forgetting documentation. The approval percentage definitely went down dramatically by outsourcing the prior authorizations to the clinics. It was not a good setup for success."

80.     FE 2, a former Territory Manager who worked in several phases of the PAAP in two different geographic territories, explained how integral the PAAP was to the Company's sales growth prior to the changes, stating that "the Inspire prior authorization team was so good. They were our best weapon in our offices and in getting patients on the table quicker."

81.     FE 2 stated that direct engagement with medical providers throughout the process was essential, and in many instances it was "the difference between losing a patient and maybe keeping a patient." FE 2 provided an example to illustrate the impact of the changes, involving a patient with an Apnea-Hypopnea Index ("AHI") that was below the level required by the patient's insurance for approval of the Inspire device:

> I'll tell you a way in which we've been able to affect that process. For example, an office submits a patient packet to the Inspire auth team. We, the rep, get notified, as well as the office, as soon as our auth team reviews the intake packet. Say, the patient has an AHI of 16 events/hr and it's a Blue Cross Blue Shield patient and the requirement is 20 events/hr, so right away, *within one business day, we're alerted, "Hey, this is never going to get approved. We can't even submit this*." You could submit it, but it's going to get kicked back. *We know right away this patient needs to do another sleep study*, and hopefully, their AHI is 20 events/hr *versus if this office was doing that independently, it*

*would be weeks before we ever, or maybe we never hear about it, and then that patient just falls to the wayside*. **"Hey, you're not going to be approved. Blue Cross denied it,"** versus if you, the rep, know this, I'm calling that office, I'm calling that staff person saying, "Hey, we need to talk to this patient. They need to do an in-lab sleep study because their home sleep study, their AHI was too low, but if they do an in-lab, they're probably going to be above 20 events/hr and we can get that patient approved." ***That's the difference between losing a patient and maybe keeping a patient.***

82.     FE 2 recalled resisting the changes as it reduced visibility into the Company's sales pipeline, stating:

> They were starting to [leave the medical providers to do prior authorizations on their own] when[] I was still there. The ask was to get [the medical] offices independent. I personally had zero motivation to do that because it takes away, from a rep perspective, your visibility into what's going on. We, as reps, really relied on that prior auth process . . . they were asking us to do that, and I was like, "Absolutely not."

83.     FE 2 further explained that the changes "slow[ed] down the time that it takes from patient to get submitted to patient on table." FE 2 stated that "[i]t really slows down that process versus the Inspire team . . . if [the Inspire team is] doing it, you can affect the process and get patients implanted quicker. ***I think it is absolutely a massive slowdown***."

84.     FE 2 confirmed that, due to the intricate nature of the prior authorization process, medical providers were unable to handle the process themselves, stating that "the authorization process is always going to be complicated just because there are so many criteria that you need to make sure are met . . . [medical providers are]

never going to do it as quickly as the dedicated Inspire team." FE 2 continued:

> [T]hese people who manage the prior authorization process inside the physician's office, there's a lot of turnover in that job. You get your amazing auth girl [i.e. prior authorization staffer] trained up to where she understands these are exactly the things that need to be submitted to insurance, these are the criteria. Once you get that person trained up, who knows how long she's going to be with the practice? It's a revolving door in most offices, so it's a never-ending task of the territory manager to continue to train those people...*they're never going to be as quick and efficient as the dedicated Inspire team*.

85.     FE 3, a former Inspire Territory Manager responsible for the sale of the Inspire device in Iowa, explained that understaffing at medical offices contributed to their inability to effectively manage the prior authorization process without Inspire's assistance, stating: "In my geographic location, there was one person trying to handle several hundred prior authorizations and trying to keep up with the demand. The demand was higher than the supply of people being able to submit these prior authorizations."

86.     FE 3 further explained that, prior to the changes, the prior authorization process took roughly 30 days, but after the changes, it would take at least 60 to 90 days and recalled the Company "los[ing] patients that were waiting too long and decided to opt out of having the procedure done." FE 3 recalled personally experiencing patients deciding against the Inspire device due to delays in the prior authorization process, stating that "patients quickly lost interest" when the implant was delayed.

87. FE 3 stated that the Individual Defendants learned in early 2023 at the latest that the changes were seriously detrimental to Inspire's business and that, having lost visibility into the Company's sales pipeline, management understood that they "didn't have their finger on the pulse."

88. FE 4, a former Inspire Territory Manager in the Wisconsin area, confirmed that the prior authorization process was extremely thorough and complicated. Prior to the changes, FE 4 was involved throughout the process, explaining that for each patient, "certain criteria needed to be met," including a Body Mass Index (BMI) under 32, difficulty with other treatments like CPAP, and an AHI score of 15-20.[2] FE 4 was regularly involved in the Drug Induced Endoscopy procedure that was required as a part of the prior authorization process.

89. FE 4 recalled learning about the changes in January 2023 and immediately informing FE 4's supervisor that the changes would be highly problematic. FE 4 stated that Inspire failed to adequately prepare medical offices for the shift, providing them only with a one-page "marketing piece," despite objections from medical offices.

90. FE 4 explained that the Individual Defendants became aware of the reduction in prior authorizations early in 2023 because they closely monitored the prior authorization process for all patients with Microsoft Dynamics software. FE 1

---

[2] AHI is a measure of the number of apneas that a patient experiences each hour.

similarly stated that several Company employees, including FE 1's supervisor and Area Vice President, "were all referencing this up to the CEO. This started pretty early in the process." FE 1 further recalled Defendant Herbert discussing the slowdown himself during a Company conference call no later than the second quarter of 2023.

***The Individual Defendants' False and Misleading Statements***

91.     On May 2, 2023, the Company hosted an earnings call to discuss its financial results for its first fiscal quarter of 2023 ("1Q2023 Earnings Call"). During the earnings call, Defendant Herbert touted the Company's ability to convert prospective patients into actual customers, stating that Inspire had "steadfastly improved our conversion of contact to patients receiving therapy":

> In the first quarter, the number of visitors to our website surpassed 3.4 million, which is significant. The website is the introduction for patients and the source of the growth in therapy adoption. In January of 2022, we initiated our first national media campaign, which resulted in a onetime spike in website visitors surpassing the 3.4 million in the first quarter, but the current volume has us in a very strong position entering 2023. From these visits, we had over 19,000 physician contacts ***and have steadfastly improved our conversion of contact to patients receiving therapy*** ... And finally, our focus continues towards increasing surgeon capacity, and ***we see signs of improvement in the patient pathway and specifically by reducing the time from patient contact to implant***.

92.     During the same earnings call, Defendant Herbert stated that the PAAP's "digital scheduling pilot continues to make strides and we are currently experiencing a ***30% improvement in physician appointments in the pilot centers***

*compared to traditional phone and e-mail scheduling through our Advisor Care*

*Program* and are adding technology to support the next wave of participating

centers."

93.     The statements issued during the 1Q2023 Earnings Call were materially

false and misleading and omitted to state material adverse facts necessary to make

the statements not misleading because they failed to disclose that: (i) at the time of

the issuance of these statements, the Company had dramatically reduced its

involvement in the prior authorization process; (ii) as a result, by this time, the

Company had begun losing customers as many prospective patients lost interest due

to exorbitant delays in the process and many others were rejected by their insurance

due to errors in their applications and inadequate documentation; and (iii)

accordingly Inspire had not "steadfastly improved [its] conversion of contact to

patients receiving therapy," and the Company did not "reduc[e] the time from patient

contact to implant."

94.     On May 16, 2023, Defendant Herbert spoke on behalf of Inspire at the

RBC Capital Markets Global Healthcare Conference. During the Conference,

Defendant Herbert stated:

> [Sales representatives] used to be [compensated based on] something
> called PET, patients expecting therapy, that we had for the first five
> years because we used to remember it could take 4 to 6 months to get
> an insurance approval. ***Now we get approved in just 2 to 5 days. So we
> really are in the phase of teaching center[s] that - to help them just
> kind of submit their own prior authorizations.*** So now we need to do

a transition of sales team a little bit and we incent them more on having high utilized centers, high utilization centers. As we talked about, primary purpose, center with the highest utilization has the best patient outcomes. So if a center has two procedures a month, they get a certain bonus level. If they have four a month, it goes up. Six a month. Eight a month. So it's an accelerator based on the utilization of centers to incent the sales reps or the territory managers to really focus on high utilization, **which in turn is going to drive high patient outcomes.** Started January 1 and **it's been well received so far.** The sales force really is able to understand the need to have an incentive like that and they know how to really get behind it and be able to drive the utilization. **So it's been very well received.**

95.     This statement was materially false and misleading and omitted to state material adverse facts necessary to make the statement not misleading because it failed to disclose that: (i) the timeline of Inspire's PAAP had not reduced to "2 to 5 days," but had actually dramatically increased due to the Company's divestments; (ii) the Company had not been "teaching center[s]" how to "submit their own prior authorizations," but had actually stopped helping centers, leaving them to manage the process on their own; (iii) as confirmed by former employees, these changes were not "well received" by the Company's sales personnel or by the medical centers left to handle the prior authorization process without guidance or assistance; and (iv) as a result of the foregoing, the Company had begun losing customers at the time of the issuance of this statement.

96.     On August 1, 2023, the Company hosted an earnings call to discus its financial results for the second fiscal quarter of 2023 ("2Q2023 Earnings Call"). During the earnings call, Defendant Herbert again highlighted the PAAP:

In the second quarter, the number of visitors to our website surpassed 2.9 million. From these visits, we had over 12,000 physician contacts. And even with the typical summer slowdown in contact, *we steadfastly improved our conversion of patients receiving therapy.*

97.     Also during the earnings call, the following exchange occurred between

an analyst with Truist Securities and Defendant Herbert:

Richard Samuel Newitter Truist Securities, Inc., Research Division:

And then kind of a generic question with respect to the utilization backdrop for a number of elective procedures out there. It's been strong in the first half, above trend. I know you guys are in a different situation, so underpenetrated into this huge TAM. *But I'm curious to the extent to which you're seeing any kind of backlog or pent-up demand that's continuing to come in and support strong results?* And if you are, what the outlook is from a contribution standpoint as we move into the back half?

Timothy P. Herbert CEO, President, and Director of Inspire Medical Systems, Inc.:

*Yes we are.* I think *we're seeing continued growth across all of our centers*. Obviously, *same-store sales drove the growth in Q2, as it did in Q1, and I think will continue to do so as we move forward*. I think that we're excited, again, about the pop that we saw with Medicare in the second quarter. And I think that kind of overwhelmed a little bit more of the commercial cases, which will come on strong in the second half. So the demand continues to be there. As you mentioned, Rich, we continue to be underpenetrated in the TAM. And we still have limitations on the number of surgeons performing the procedures. So we still need to continue to address that and work the backlog of patients. But absolutely, people want to have -- step in and have their obstructive sleep apnea taken care of. Demand from our direct-to-consumer continues to be very effective. Our contacts are high. *Our efficiency and conversions of patients through implant continues to be strong.* We just got to continue to open up more OR time by training and getting ENTs to commit more of their time to these patients.

98. The statements issued during the 2Q2023 Earnings Call were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company did not "steadfastly improve [its] conversion of patients receiving therapy," but had actually been losing higher rates of potential customers due to issues and delays with the prior authorization process after Inspire reduced its involvement with the process; (ii) the Company was not experiencing "growth across all of its centers," but was rather experiencing delays and insurance denials at significantly higher rates; and (iii) similarly, Inspire's "efficiency and conversions of patients through implant" did not "continue[] to be strong."

99. On September 6, 2023, Defendant Buchholz presented at the Wells Fargo Securities Healthcare Conference on behalf of the Company. During the Conference, the following exchange occurred between Defendant Buchholz and an analyst from Wells Fargo regarding Inspire's financial guidance:

> Lawrence H. Biegelsen Wells Fargo Securities, LLC, Research Division:
>
> I wanted to touch upon the outlook, Rick. How are you thinking about seasonality this year? I mean you guys have a pretty seasonal business when we look at prior years. Anything different about this year? The guidance implies more seasonality than we've typically seen.
>
> Richard J. Buchholz Chief Financial Officer of Inspire Medical Systems, Inc.:

Yes. I mean we haven't changed our guidance philosophy at all since day 1, which is just now over 5 years since we've been a public company. And we did mention in the second quarter that we had a little bit higher mix of Medicare versus commercial. But that's similar to other companies that have called that out. But really, we expect that to revert back to a heavier commercial mix in the second half of the year because we do have a little bit more pronounced seasonality in the fourth quarter because of the deductible plans resetting because the majority of our -- more than the majority of our procedures are commercial cases.

Lawrence H. Biegelsen Wells Fargo Securities, LLC, Research Division:

I mean on the Medicare, there's been – on the Medicare mix in Q2, there's been some concern among investors that, based on what some of the managed care companies have said, that there's been some like pent-up demand, some bolus of patients that came through in the second quarter. And you talked about the mix reverting. Is this a headwind to you guys, this mix issue?

Richard J. Buchholz Chief Financial Officer of Inspire Medical Systems, Inc.:

No. I mean we're – we have a robust pipeline of patients awaiting therapy. So don't expect that to be a headwind.

100.    The statements issued during the Wells Fargo Securities Healthcare Conference were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company had dramatically divested from the PAAP and had significantly reduced its involvement with the process; and (ii) as a result, and as confirmed by former Inspire employees, the Company had experienced "absolutely a massive slowdown" in prior authorizations and had been losing customers due to

delays and issues with the prior authorization process. Accordingly, it was misleading to state that the Company's reduced revenue from commercial insurance reimbursement would not be a headwind due to Inspire's "robust pipeline of patients awaiting therapy."

***The Truth Emerges***

101.  On November 7, 2023, the Company issued a press release, reporting its financial results for the third fiscal quarter of 2023, revealing revenue of $153.3 million, below analyst estimates for the quarter. In the press release, the Company attributed its poor financial results to its implementation of "a pilot program regarding prior authorization submissions by [its] customers":

> Early in the year, we implemented a pilot program regarding prior authorization submissions by our customers, and in ***tracking the results of the program***, ***we observed a decline in prior authorization submissions for patients seeking Inspire therapy***. After recognizing this trend, we reinvigorated our efforts to facilitate patient access to Inspire therapy by more closely engaging with our customers with the prior authorization submission process, including involving our corporate prior authorization team to assure consistency and accuracy of submissions.

102.  During the Company's earnings call, hosted that same day, Defendant Herbert specifically revealed that the Company's disappointing financial results were due to a decision by management "in early 2023" to "***minimize our involvement with [our customers'] prior authorization process***." Defendant Herbert continued, explaining that, due to the Company's changes in the PAAP, "a

significant number of our customer[s] experienced challenges with their prior authorization submission process," leading to a "decrease in the number of submissions by our customers seeking prior authorization" and an "impact on the number of implant procedures."

103.  Significantly, Defendant Herbert acknowledged that the Company was put on notice of these issues by no later than April 2023. During the call, an analyst from JPMorgan observed that the issue likely "overlapped with the second quarter call" and asked "why not mention on 2Q [call]?" In response, Defendant Herbert stated that the issues "started to become evident maybe a little bit in the second quarter" and that by "the beginning of the third quarter," the prior authorization problems had become so significant that Inspire had to "take some corrective action."

104.  On this news, the price of Inspire stock declined nearly 20% in one day, closing at $129.95 per share on November 8, 2023, wiping out roughly $920 million in market capitalization in a single day.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

105.  Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

106.  Inspire is named solely as a nominal party in this action. This is not a

collusive action to confer jurisdiction on this Court that it would otherwise not have.

107. Plaintiff is a current shareholder of Inspire and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

108. At the time this action was commenced, the nine-member Board was comprised of Defendants Herbert, Broader, Burks, Ellis, Melenikiotou, McCormick, Mead, and Tansey, along with Myriam J. Curet, who joined the Board in December 2023 and is not a party to this action. Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all, and if not all, then at least eight, of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

109. The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged

herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

110. The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

111. As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Inspire, the Individual Defendants knew, or should have known, the material facts surrounding the changes to the Company's PAAP and the resulting issues with the prior approval process.

112.    Defendant Herbert is not disinterested or independent, and therefore, is incapable of considering a demand because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

113.    Defendants Melenikiotou, McCormick, and Mead serve as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's underinvestment in its brand and core product offerings and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Melenikiotou, McCormick, and Mead cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

114.    Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current

directors from calling into question the other Individual Defendants' conduct or taking any remedial actions to redress the conduct alleged herein.

115.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds *i.e.*, monies belonging to the stockholders of Inspire. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Inspire, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

116.    If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Inspire to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly,

demand is futile in that event as well.

117. Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

**COUNT I**
**Against the Individual Defendants for**
**Breach of Fiduciary Duties**

118. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

120. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

121. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate

internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

122.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

123.   Plaintiff, on behalf of Inspire, has no adequate remedy at law.

**COUNT II**
**Against the Individual Defendants for**
**Aiding and Abetting Breach of Fiduciary Duty**

124.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.   By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties.

In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

126.   Plaintiff, on behalf of Inspire, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for
### Unjust Enrichment

127.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Inspire.

129.   The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Inspire that was tied to their performance or to the artificially inflated valuation of Inspire.

130.   Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

131.   As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

132. Plaintiff, on behalf of Inspire, has no adequate remedy at law.

## COUNT IV
**Against the Officer Defendants for Contribution Under**
**Section 10(b) and 21D of the Securities Exchange Act of 1934**

133. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134. Inspire, along with the Officer Defendants, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

135. The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Inspire securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

136. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in

whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

137.  The Officer Defendants, because of their positions of control and authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

138.  Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

139.  As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

### COUNT V
**Against the Individual Defendants for Waste of Corporate Assets**

140.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.  The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Inspire's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal,

unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

142. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Action, and approving performance-based compensation linked to the Company's perceived successes.

143. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

144. Plaintiff on behalf Inspire has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust

thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 16, 2024

**ALTMAN LAW, PLLC**

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683.3516
Facsimile: (302) 654-7530
Email: tjm@rl-legal.com
Email: sa@rl-legal.com

**GRABAR LAW OFFICES**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  267-507-6085
Email: jgrabar@grabarlaw.com

*/s/ Adam Altman*
Adam Altman
6701 West 23rd Street
St. Louis Park, MN 55426
Telephone: (612) 335-3700
Facsimile: (612) 928-2842
Email: adam@altmanlf.com

*Attorneys for Plaintiff*

Docusign Envelope ID: 0AA744E4-52C3-43F3-A154-7F1736FE9F95

## <u>VERIFICATION OF LAWRENCE HOLLIN</u>

I, Lawrence Hollin, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 7/9/2024

_Lawrence Hollin_
940EF71032E3440...

Lawrence Hollin